In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3231

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN NATALE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 CR 594—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED APRIL 18, 2013—DECIDED JUNE 11, 2013

Before BAUER, FLAUM and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* When another doctor reviewed the post-surgical CT scan from one of Dr. John Natale's patients, something did not seem right. Natale had previously repaired the patient's aortic aneurysm, and the images from the CT scan did not match the procedure Natale described in his operative reports. An investigation culminated in Natale's indictment for health care fraud related to his Medicare billing, mail fraud for his

use of the mails in receiving the Medicare reimbursement checks, and false statements related to health care for the inaccuracies in his operative reports and other medical notes. The jury acquitted Natale on the fraud counts but convicted him of making false statements in violation of 18 U.S.C. § 1035. When charging the jury on the false statement counts, the trial court used instructions that seemingly permitted conviction for false statements completely unrelated to Medicare reimbursement. Natale now challenges that instruction along with several of the district court's evidentiary rulings. We agree that the district court's instruction on the false statements charges swept too broadly and allowed conviction for conduct not covered by the statutory text. We now clarify the meaning of § 1035 and identify the proof required for conviction. Because the erroneous instruction was harmless in Natale's case, however, and because we see no error in the district court's evidentiary rulings, we affirm Natale's conviction.

## I.  Background

### A.  Factual Background

Natale is a vascular surgeon who performed surgeries out of Northwest Community Hospital in Arlington Heights, Illinois. He specialized in the treatment of aortic



**Figure 1: Anatomy of the Aorta**
*Your Aorta*, Med. Univ. of S.C.,
www.muschealth.com/aorta/your_aorta/ (accessed May 2, 2013).

aneurysms, a condition involving weakened vascular walls in the aorta, the main artery exiting the heart. Treatment for aneurysms generally involves surgery, during which the surgeon cuts out the weakened arterial tissue and replaces it with a synthetic graft.

Treatment of aortic aneurysms is especially complex. The aorta is the main conduit delivering oxygenated blood from the heart to other body parts. It thus consists of a wide tube that leaves the heart and extends down the center of a person's torso. *See* Figure 1. As such, it is much like an interstate highway—large, wide, and designed to deliver high volumes of blood (which would be like cars on the highway) quickly to the destination body parts. And just as an interstate highway has exits that divert

traffic to smaller local roads, arteries branch off from the aorta to deliver blood to the various organ systems throughout the body. For example, the hepatic artery carries blood to the liver; the gastric artery de-livers blood to the stomach; and the renal arteries ensure perfusion of the kidneys. *See* Figure 2. The aorta ultimately



Figure 2: Anatomy of the Aorta and Related Arteries
Aorta, *Encyclopedia Britannica Online Academic Edition* (2013), www.britannica.com/EBchecked/topic/29195/aorta.

forks into two branches, becoming the left and right iliac arteries. The iliac arteries in turn become the femoral arteries, which carry blood to the legs and lower extremi-ties.

Surgeons use two different types of synthetic grafts to repair the weakened aortic walls. A tube graft performs

exactly as its name implies. A tube replaces the weakened arterial wall (or is used to create a bypass around the weakened artery). *See* Figures 3B and 4B. The tube graft attaches to the aorta itself, before the vessel splits into the iliac arteries. In contrast, a bifurcation graft splits into two branches at its lower end, with the two branches attaching to the iliac arteries, not the aorta. As a result, the bifurcation graft itself has the shape of an upside-down "Y". *See* Figures 3A and 4A.

While all aortic aneurysms present complications, aortic aneurysms above (suprarenal aneurysms) or near (juxtarenal aneurysms) the renal arteries prove especially difficult. Treating these aneurysms requires the surgeon to clamp the renal arteries, sever them from the aorta, replace the juxtarenal segment of the aorta with a graft, and reattach the renal arteries to the graft. As a result, post-operative renal arteries attach to and branch off from the synthetic graft, not the natural aorta.

Medicare requires doctors to submit bills using a five-digit "CPT" code, which determines the level of Medicare reimbursement. Because aneurysms involving the renal arteries require a more complex procedure, Medicare reimburses such surgeries at higher rates than simpler repairs. In this case, the indictment accused Natale of performing the simpler repair surgery while submitting the CPT codes and receiving reimbursement for treatment of the more complex suprarenal aortic aneurysm. For the surgeries described in the indictment, use of these billing codes netted Natale about $3,700 more, in total, than the codes for less complex aneurysms allowed.

More specifically, Natale faced two counts of health care fraud, *see* 18 U.S.C. § 1347, one count of mail fraud, *see id.* § 1341, and two counts of making false statements relating to health care matters, *see id.* § 1035. At the root of all five counts sat alleged falsities contained in the operative reports for several of Natale's patients. According to the government, these statements gave the impression that Natale had performed the more complex procedure involving the renal arteries. Among other statements, for example, Natale dictated that he "reimplanted" or "implanted" renal arteries of several patients.[1] His operative notes also stated that a "button of the right renal artery tissue was then cut out and sewn to a portion of the graft with 5-0 Prolene." Thus, he described sewing the renal arteries directly into the synthetic graft (the 5-0 Prolene) as if he had repaired an aneurysm involving the renal arteries. In addition to these statements (and others) suggesting involvement of the renal arteries, Natale's operative reports and other notes suggested use of bifurcation grafts rather than tube grafts. For example, one note explains that he "extended the limbs of the bifurcation graft down to the external iliac artery bulge." In reality,

---

[1] Reimplantation involves replacement of the arteries and reestablishment of blood flow. *See* Stedman's Medical Dictionary 1672 (28th ed. 2006) (entry for "replantation," a synonym of reimplantation). Thus, Natale's use of this word suggests he had severed the renal arteries from the aorta and reattached them after repairing the aneurysm, a procedure that would have justified the higher billing codes for an aneurysm involving the renal arteries.

the government charged, Natale had performed a simple repair below the renal arteries using only a tube graft. These allegedly false statements in the operative reports provided both the misrepresentations necessary for the scheme to defraud and the falsities necessary for the false statement counts.

## B. Procedural History

At trial, the government offered the expert testimony of Dr. George Anton, a surgeon with Hillcrest Hospital in Cleveland. Anton testified that Natale supported his use of the higher-paying billing codes through the statements in the operative reports. Operative reports generally provide a summary of the surgery—describing what procedure was done, what the doctor noticed, what complications, if any, occurred, etc. Northwest Community policy required completion of and submission of operative reports following all surgeries.

Anton also identified what he believed were false statements in Natale's operative reports. While the reports indicated that Natale had inserted bifurcation grafts involving the renal arteries, Anton believed that Natale had instead used simple tube grafts below the renal arteries—a procedure that would not justify the billing codes Natale had submitted. Anton reached this conclusion by comparing post-surgical CT scans of Natale's patients with the procedures described in Natale's operative reports and other notes. Anton could make this comparison because synthetic material appears differently from natural tissue on the CT scans.

Thus, when viewing these scans, Anton could see precisely what type of graft Natale had used and where these grafts attached to the aorta.

According to Anton, the CT scans showed only a tube graft, the top of which attached to the aorta below the renal arteries and the bottom of which attached to the aorta above the iliac arteries. *See* Figures 3B and 4B. Natale's operative reports and other notes, however, suggested that Natale had inserted a bifurcation graft that attached to the aorta above the renal arteries—thereby requiring that the renal arteries attach to and branch off from the synthetic graft—and below the end of the aorta, attaching to each iliac artery. *See* Figures 3A and 4A. Although the operative reports described bifurcation grafts, Natale did not use billing codes for bifurcation grafts. Anton also used demonstrative exhibits to help the jury visualize his opinions and testimony.



Figure 3: Anton's Demonstrative Exhibit for Patient Marinier

Figure 3A ("Operative Report") depicts the procedure described in Natale's Operative Report for Patient Marinier. Figure 3B ("Actual Operation") depicts Anton's opinion of the procedure that Natale actually performed, based on Anton's study of the CT scans.

Another government witness, Kelly Hartung, described Medicare practices, policies, and procedures. Hartung worked for the corporate contractor charged with administering the Medicare program in Illinois and several other Midwest states. She told the jury that Natale had submitted billing codes for aneurysm repair involving the renal arteries, consistent with Natale's notes but inconsistent with Anton's reading of the CT scans. Hartung also testified that, when doctors enroll in the Medicare program as an authorized biller, they receive notice of Medicare policies, procedures, and rules, and acknowledge having read and understood those rules. At various other points in the claim submission process, doctors reaffirm their knowledge of Medicare billing rules and policies, verifying



Figure 4: Anton's Demonstrative Exhibit for Patient Gordon
Figure 4A ("Operative Report") depicts the procedure described in Natale's operative report for Patient Gordon. Figure 4B ("Actual Operation") depicts Anton's opinion of the procedure that Natale actually performed, based on Anton's study of the CT scans.

that the bills they have submitted were for work actually performed and medically necessary. Finally, Hartung told the jury about Medicare's auditing process, explaining that during an audit, Medicare "would request documentation. That request . . . can be for the operative report[,] . . . X-rays, lab notes, [and/or] personal office notes that a physician may have made."

Like the Medicare representative, Anton also discussed operative reports. He made no mention of their relevance in Medicare billing, but he did explain that operative reports help doctors make treatment decisions following surgery. They are especially helpful—and important—for physicians who did not perform the surgery on the patient but are tasked with future treatment.

Medicare never requested, received, or reviewed the operative reports describing the surgeries at issue in this case. Nor did this case arise from a Medicare audit. Instead, one of Natale's patients sought treatment from a competing vascular surgeon at Northwest Community. (It's unclear, but ultimately irrelevant, whether the patient sought treatment for the same or a different condition.) That surgeon ordered the CT scans and noticed the discrepancies to which Anton later testified at trial. He reported Natale to the review committee at Northwest Community, ultimately resulting in this investigation and prosecution.

Natale testified in his own defense. He acknowledged that the grafts at issue did not extend above the renal arteries, but described the aneurysm as juxtarenal, placing it just below the renal arteries. As a result, he explained, "there was insufficient healthy aortic tissue below the renal arteries with which to sew the top end of the graft." This situation ordinarily would require the synthetic graft to extend beyond the aortic junction with the renal arteries, thereby requiring the surgeon to incorporate the renal arteries into the graft. Rather than doing so, however, Natale told the jury he used a technique that he had learned as a resident at Rush Presbyterian (dubbed the "Rush Technique" at trial). According to Dr. Cyrus Serry, who served as attending physician at Rush during Natale's residency, the Rush technique involves folding over the weakened aortic wall to double its thickness. This doubled-over tissue strengthens the aortic wall, permitting attachment of the top end of the graft where, previously, the tissue had been too weak to support such attachment. Because the graft can attach to the doubled-over,

strengthened aortic wall, the renal arteries need not be severed and sewn into the graft. This technique, Serry testified, is more complex than the standard repair for a suprarenal aneurysm because the surgeon must ensure that the doubled-over flaps do not obstruct the openings to the renal arteries. Moreover, because the technique involves a doubling-over of aortic tissue and no synthetics, use of this technique would not appear on a later CT scan.

Medicare has not designated a billing code for the Rush Technique. (Nothing in the medical literature has ever described the Rush Technique.) As a result, Natale explained, he did as he was instructed at Medicare training sessions and chose the billing code that most approximated the procedure he had performed. Because the Rush Technique was, in Natale's view, the "functional equivalent" of a procedure incorporating the renal arteries into the synthetic graft, Natale submitted the billing codes for that procedure, rather than the billing codes for repair of an aortic anuerysm not involving the renal arteries.

Natale also admitted that his operative reports and other notes contained inaccuracies. He attempted to explain away these errors by characterizing them as innocent mistakes. They arose, he told the jury, from his status as the "busiest cardiovascular thoracic surgeon in the Northwest Suburbs" and his sloppiness in dictating the reports—as many as eighty to one hundred records at a time, sometimes several weeks after performing the surgery. Finally, Natale told the jury he did not have billing in mind when dictating the reports, noting

that the reports identified several procedures and items that he should have billed to Medicare but did not.

The government's rebuttal witness challenged Natale's invocation of the Rush Technique. While Dr. John Peters—Natale's surgical assistant at the time of the surgeries at issue—admitted that the Rush Technique "sounded familiar," he testified that he did not remember Natale performing the Rush Technique during the surgeries in this case.

After closing arguments, the parties agreed on jury instructions—without objection from Natale on the instructions at issue—and the district court so instructed the jury. The district court also, over Natale's objection, permitted the jury to take Anton's demonstratives into the jury room during deliberations. Importantly, the government "stripped down" the demonstratives that the jury used during deliberations. Unlike the two diagrams presented in Figures 3 and 4, the demonstratives used during deliberations did not contain the headings "Operative Report" and "Actual Operation." Instead, it just contained the pictures that Anton used when testifying.

The jury ultimately acquitted Natale on all three fraud counts but found him guilty on the false statement counts. Natale moved for a new trial based on the jury's use of the demonstratives during deliberations, which the district court denied. He made no other post-trial motions and received a ten-month prison sentence on top of a $40,000 fine. Natale now appeals.

## II. Discussion

### A. The Plain Error in the District Court's False Statement Instructions Was Harmless

Natale's primary challenge to his conviction focuses on the jury instructions that the trial judge issued on the false statement counts. The government responds that Natale has waived any challenge to these instructions because he affirmatively approved of them at the jury instruction conference. Moving through the proposed instructions one by one, the district court asked, "[Proposed Instruction] No. 29 is making false statements instruction out of 18 United States Code, Section 1001, and 18 United States Code, Section 1035. Any problem with that?" Defense counsel's response: "No." Counsel engaged in a similar question-and-answer colloquy regarding the remainder of the instructions on the false statements counts, with the trial court asking counsel if he "had any problem with" each proposed instruction. Each time, counsel affirmatively expressed having no problem with the proposed instruction. The government now suggests that the defense attorney's comments during this exchange affirmatively approved the jury instruction, resulting in waiver.

Ordinarily, when a defendant does not object to a jury instruction before the jury retires to deliberate, the defendant may later attack that instruction only for plain error. Fed. R. Crim. P. 30(d); *Johnson v. United States*, 520 U.S. 461, 465-66 (1997). However, a defendant who waives—rather than forfeits—his objection cannot avail himself of even the demanding plain error standard of

review. *See United States v. Olano*, 507 U.S. 725, 732-33 (1993) ("Deviation from a legal rule is 'error' unless the rule has been waived."); *United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009) ("Waiver 'extinguishes any error' and 'precludes appellate review.'" (citing *United States v. Pree*, 408 F.3d 855, 872 (7th Cir. 2005)). He has no recourse and generally must live with his earlier decision not to press the error. Such waiver occurs only when a defendant makes a "knowing and intentional decision" to forgo a challenge before the district court. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005). In contrast, when the "defendant negligently bypasses a valid argument," he has merely forfeited the claim and can raise it on appeal, subject to plain error review. *United States v. Vasquez*, 673 F.3d 680, 684 (7th Cir. 2012) (citing *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010)). We generally construe waiver "liberally in favor of the defendant." *Jaimes-Jaimes*, 406 F.3d at 848.

Although passive silence with regard to a jury instruction permits plain error review, *see* Fed. R. Crim. P. 30(d); *see, e.g.*, *United States v. Mitan*, 966 F.2d 1165, 1177 (7th Cir. 1992), a defendant's affirmative approval of a proposed instruction results in waiver, *e.g.*, *United States v. Courtright*, 632 F.3d 363, 371 (7th Cir. 2011). Our cases have strictly applied this rule to affirmative expressions of approval without examining whether the statements were a "knowing and intentional decision" or resulted

from "negligently bypass[ing] a valid argument."[2] *See Courtright*, 632 F.3d at 371; *United States v. O'Connor*, 656 F.3d 630, 644 (7th Cir. 2011); *DiSantis*, 565 F.3d at 361; *United States v. Griffin*, 493 F.3d 856, 863 (7th Cir. 2007) [hereinafter *Griffin I*]; *United States v. Anifowoshe*, 307 F.3d 643, 650 (7th Cir. 2002); *United States v. Salerno*, 108 F.3d 730, 742 (7th Cir. 1997); *United States v. Lakich*, 23 F.3d 1203, 1207-08 (7th Cir. 1994); *United States v. Canino*, 949 F.2d 928, 940 (7th Cir. 1991). As a result, affirmative statements as simple as "no objection" or "no problem" when asked about the acceptability of a proposed instruction have resulted in waiver. *See O'Connor*, 656 F.3d at 644; *Griffin I*, 493 F.3d at 863; *Anifowoshe*, 307 F.3d at 650; *United States v. Griffin*, 84 F.3d 912, 923-24 (7th Cir. 1996) [hereinafter *Griffin II*]. *But see United States v. Roglieri*, 700 F.2d 883, 888 (2d Cir. 1983) (applying plain error review where defense counsel explicitly expressed no objection to the jury

---

[2] Other circuits have not applied this rigid rule and instead have analyzed whether a deliberate, strategic reason could have justified the attorney's affirmative approval of a jury instruction. *United States v. Rucker*, 417 F. App'x 719, 721-22 (10th Cir. 2011) (non-precedential decision); *Virgin Islands v. Rosa*, 399 F.3d 283, 291 (3d Cir. 2005); *United States v. Perez*, 116 F.3d 840, 845-46 (9th Cir. 1997) (en banc); *United States v. Drougas*, 748 F.2d 8, 30 (1st Cir. 1984) ("Defense counsel explicitly approved the reasonable doubt instruction and is thus precluded . . . from now objecting absent plain error."); *United States v. Wiggins*, 530 F.2d 1018, 1020 (D.C. Cir. 1976) (applying plain error standard when defense counsel expressed satisfaction with jury instruction).

instruction). We have applied this rule strictly because of the difficulty in teasing out the subjective motivations behind the "no objection" statement—from that statement alone, a court cannot easily discern whether the attorney bypassed a challenge for strategic reasons (which would result in waiver) or whether the attorney simply failed to recognize error that he otherwise would have raised. As *Anifowoshe* explained, failure to find waiver from affirmative statements of "no objection" and the like would "create an almost insurmountable standard to proving waiver." 307 F.3d at 650.

This approach can sometimes produce especially harsh results. Just as the district court did in Natale's case, a thorough district court judge will almost always hold a jury instruction conference and put up the proposed instructions, one by one, for discussion by the attorneys. *See United States v. Hollinger*, 553 F.2d 535, 542 (7th Cir. 1977) ("An on-the-record instructions conference . . . clearly enables the trial judge, in advance of instructing the jury, to have erroneous aspects [of the instructions] pointed out to him."). The result: A trial court will almost always require of counsel some affirmative response— such as "no objection" or "no problem"—that will operate as waiver on appeal. Only rarely will a jury instruction conference provide the opportunity for agnostic silence that preserves plain error review. In short, as our cases have applied this rule, a defense attorney who has not objected to a proposed instruction will nearly always waive any potential objection, regardless of whether his "no objection" resulted from a reasoned, strategic deci-

sion or from a negligent failure to recognize the error.[3]

An approach that might mitigate this harshness and leave open a wider window for forfeiture than our cases have previously done could be considered when, as in this case, defense counsel's affirmative approval of the jury instruction is nothing more than a simple "no" or "no objection" during a rote call-and-response colloquy with the district judge. In such an instance, we could more closely examine whether the defendant has truly waived his challenge to the jury instruction or merely forfeited it. *Cf. United States v. Alcala*, 678 F.3d 574, 579 (7th Cir. 2012) ("[N]arrative responses in a plea colloquy are superior to inquiries from the court that elicit 'yes' or 'no' answers[.]"); *United States v. Groll*, 992 F.2d 755, 760 n.7 (7th Cir. 1993) ("[S]imple affirmative or negative answers to the court's rote interrogatories give us pause in finding that [the defendant] entered her plea knowingly."); *United States v. Fountain*, 777 F.2d 351, 356 (7th Cir. 1985) ("Simple affirmative or negative answers or responses

---

[3] Such harshness is only magnified by the importance of the jury instruction in a trial. Even though erroneous jury instructions are not the type of structural error that necessarily creates harm in a criminal trial, *see United States v. Griggs*, 569 F.3d 341, 344 (7th Cir. 2009), the Rules of Civil Procedure recognize the weighty role jury instructions fill: In all but the context of jury instructions, a party who fails to preserve an error in a civil trial has no recourse on appeal. In contrast, a party can still challenge a jury instruction in a civil case for plain error notwithstanding his earlier failure to object. Fed. R. Civ. P. 51(d).

which merely mimic the indictment or the plea agreement cannot fully elucidate the defendant's state of mind as required by Rule 11.").

Additionally, we note that waiver is not an absolute bar on our consideration of issues not preserved below, even if intentionally foregone for strategic reasons. When the "interests of justice" so require, we may reach the merits of a waived issue. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) (citing *Judge v. Quinn*, 624 F.3d 352, 360 (7th Cir. 2010)). Perhaps erroneous jury instructions—especially jury instructions that inaccurately state the law by minimizing or omitting elements required for conviction—would more readily present the circumstances that allow consideration of waived issues: a "miscarriage of justice," "equities heavily preponderat[ing] in favor of correcting" the error, or "plain error that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 608-09 (citing 36 C.J.S. Federal Courts § 458)); *see also Olano*, 507 U.S. at 736 (noting that "conviction or sentencing of an actually innocent defendant" qualifies as a "miscarriage of justice").

In any event, we need not reach any of these issues in this case for even in applying plain error review to the instructions in Natale's case, we find no error requiring a new trial. Thus, we leave open the question of whether *Griffin I*, *Anifowoshe*, and our other waiver cases have drawn too confining a line by viewing affirmative approval so expansively as to include "no objection" in response to a trial court's inquiry. And neither do we

address today whether Rule 30(d) requires the more searching analysis used by other circuits that dives into the subjective motivations of counsel, hoping to discern whether strategy or inadvertence motivated the affirmative approval. Finally, we express no opinion on whether the erroneous instructions in this case present the interests of justice that require our consideration notwithstanding any waiver. In short, when reviewing the jury instructions under plain error as Natale asks of us, we see no reason to vacate his conviction.

Plain error requires "obvious" error that is "clear under current law." *United States v. McGee*, 60 F.3d 1266, 1271-72 (7th Cir. 1995). Even then, reversal is appropriate only when the error affects the defendant's substantial rights. *United States v. Garcia*, 580 F.3d 528, 536 (7th Cir. 2009). Natale raises four challenges to the jury instructions in his case. First, he argues that the district court improperly failed to instruct the jury that conviction under § 1035 requires that the false statement be made in connection with a matter involving a health care benefit program. Second, Natale states that the jury instruction should have required false statements material to the health care benefit program. Third, Natale suggests that § 1035 requires specific intent to mislead or deceive and that the district court did not so inform the jury. Finally, Natale argues that the jury instruction as given violates due process by permitting arbitrary or discriminatory enforcement. Although portions of the district court's instruction contained errors, these errors did not affect Natale's substantial rights.

### 1. The District Court's Plain Error in Omitting the Health Care Benefit Program Requirement from the Jury Instruction Was Harmless

Natale's first challenge to the jury instruction accuses the trial judge of omitting an essential element of the offense from the instruction.[4] Section 1035 prohibits, "in

---

[4] At trial, the district judge provided the following instructions on the false statements charges:

> Counts IV and V charge the defendant with making false statements and representations relating to healthcare matters. To sustain the charge of making false statements relating to healthcare matters, the government must prove the following propositions:
>
> First, the defendant made a false, fictitious, or fraudulent statement or representation.
>
> Second, the statement or representation was material.
>
> Third, the statement or representation was made knowingly and willfully.
>
> And fourth, the defendant did so in connection with the delivery of or payment for healthcare benefits, items, or services.
>
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt as to a particular count, then you should find the defendant guilty as to that count.
>
> If, on the other hand, you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt to a
>
> (continued...)

any matter involving a health care benefit program,[5]
knowingly and willfully . . . mak[ing] any materially false,
fictitious, or fraudulent statement[] or representation[] . . .

---

[4] (...continued)

   particular count, then you should find the defendant not
   guilty.

   A statement is false or fictitious if untrue when made and
   then known to be untrue by the person making it or causing
   it to be made.

   A statement or representation is fraudulent if known to be
   untrue and made or caused to be made with intent to
   deceive.

   A false or fraudulent statement, pretense, or representation
   is material if it had the effect of influencing the action of a
   person or entity or was capable of or had the potential to do
   so. It is not necessary that the statement, pretense, or
   representation actually have that influence or be relied on
   by the person or entity so long as it had the potential or
   capacity to do so.

   An act is done willfully if done voluntarily and intentionally
   and with intent to do something the law forbids.

[5]  A health care benefit program is "any public or private plan
or contract, affecting commerce, under which any medical
benefit, item, or service is provided to any individual and
includes any individual or entity who is providing a medical
benefit, item, or service for which payment may be made
under the plan or contract." 18 U.S.C. § 24(b). Courts have
interpreted "affecting commerce" to mean affecting interstate
commerce. *See United States v. Klein*, 543 F.3d 206, 211 (5th
Cir. 2008).

in connection with the delivery of or payment for health care benefits, items, or services[.]" 18 U.S.C. § 1035(a)(2). Natale argues that the jury instruction erred in omitting the health care benefit program requirement. We agree but find that error harmless.

### a. Conviction Under § 1035 Requires as an Essential Element of Proof that the Defendant Made the False Statement in a Matter Involving a Health Care Benefit Program

We cannot find any case in our circuit clearly laying out the essential elements for § 1035. Nor has our circuit yet adopted a pattern jury instruction for this offense. In crafting the jury instruction, though, the district court appeared to rely on the pattern jury instruction for 18 U.S.C. § 1001 and identified four elements required for conviction under § 1035: (1) making a false, fictitious, or fraudulent statement or representation (2) that is material, (3) knowingly and willfully made, and (4) done in connection with the delivery of or payment for healthcare benefits, items, or services. A quick comparison of § 1035 with this jury instruction reveals that the trial court never instructed the jury that the false statement must arise in a "matter involving a health care benefit program."

Omission from the jury instruction of an essential element of the offense is erroneous. *See Neder v. United States*, 527 U.S. 1, 9-10 (1999); *United States v. Griggs*, 569 F.3d 341, 344 (7th Cir. 2009). We conclude that "any matter

involving a health care benefit program" forms an essential element of the offense. Other circuits have agreed, explaining that the government must prove a link to a health care benefit program to secure conviction under § 1035 and other health care offenses. In reviewing a challenge to the sufficiency of the evidence, for example, the Sixth Circuit noted that "[t]o establish guilt under [§ 1035] . . . the Government must prove that the defendant knowingly and willfully made false statements or representations in connection with the delivery of or payment for health care benefits, items, or services and in a matter involving a health care benefit program." *United States v. Hunt*, 521 F.3d 636, 647-48 (6th Cir. 2007) (internal punctuation omitted); *see also United States v. Klein*, 543 F.3d 206, 211 (5th Cir. 2008) (holding health care benefit program requirement is essential element of 18 U.S.C. § 1347); *United States v. Whited*, 311 F.3d 259, 261-62 (3d Cir. 2002) (analyzing health care benefit program requirement of 18 U.S.C. § 669 (embezzlement in connection with health care) as essential element of crime).

The language of 18 U.S.C. § 1001(a) also supports this conclusion. The health care benefit program requirement is the jurisdictional element of § 1035. It largely tracks, both in words used and placement within the statute, the jurisdictional element of § 1001(a). *Compare* § 1035(a) ("[w]hoever, in any matter involving a health care benefit program . . ."), *with* § 1001(a) ("whoever, in any matter within the jurisdiction of . . . [a] branch of the Government of the United States . . ."). The jurisdictional element of § 1001 is an essential element of that offense, *see*

*United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006), supporting our conclusion that the health care benefit program requirement likewise qualifies as an essential element of § 1035. *Cf. United States v. Ranum*, 96 F.3d 1020, 1027 (7th Cir. 1996) (finding analogy to § 1001 a "useful avenue of exploration, in light of the dearth of case law interpreting" the false statement statute at issue). Indeed, the legislative history makes clear that, in creating health care fraud and related crimes, Congress worried most about fraud perpetrated on insurance companies that drove up the cost of health insurance and, more generally, health care. *See* Health Care Fraud: All Public & Private Payers Need Federal Criminal Anti-Fraud Protections, H.R. Rep. No. 104-747, at 2, 12 (1996). Labeling a "matter involving a health care benefit program" anything other than an essential element of the crime would seem incongruent with the concerns that motivated the law.

The government does not dispute the district court's failure to instruct the jury on the statute's health care benefit program language. Instead, it argues that the court's instruction on the fourth element "came freighted" with the health care benefit program requirement because that instruction required a connection to "the delivery of or payment for health care benefits, items or services." Additionally, the government continues, the judge had instructed the jury on the meaning of "health care benefit program" several minutes earlier when describing the health care fraud counts. Bridging the analytical gap between these two instructions and the statute's jurisdictional element, however, is a distance too wide for the jury to cross on its own: Neither of these

instructions explicitly requires for conviction under § 1035 finding a matter involving a health care benefit corporation. And the trial judge gave no indication that any of the fraud instructions also applied to the false statements counts. What is more, the instruction on the fourth element of the false statements charge presented "health care benefits" alongside "items" and "services," phrased in the disjunctive. Thus, the fourth instruction, standing alone, suggests to the jury that the absence of health care benefits is irrelevant if the facts demonstrate a false statement made in connection with health care items or health care services. But under the statutory text, even conviction for false statements made in connection with items or services still must relate to a "matter involving a health care benefit program." The district court's jury instructions did not convey that requirement.

### b. Although this Error Was Plain, Omitting the Health Care Benefit Program Requirement from the Jury Instruction Did Not Affect Natale's Substantial Rights

The government asserts that even if error occurred, the error was not "plain" or "clear" because no pattern jury instruction existed for § 1035 and no case affirmatively delineated the elements of the offense. *See Olano*, 507 U.S. at 734. The government ignores the text of the statute, however, which quite clearly imposes the health care benefit program requirement. Moreover, other circuits have found this requirement an essential element of § 1035 and other related offenses. *See Klein*,

543 F.3d at 211; *Hunt*, 521 F.3d at 647-48; *Whited*, 311 F.3d at 261-62. Thus, the error was "clear under current law." *United States v. Eberhart*, 467 F.3d 659, 668 (7th Cir. 2006).[6]

Nevertheless, we see no harm in the district court's failure to instruct the jury on the health care benefit program requirement. *See, e.g.*, *Neder*, 527 U.S. at 9-10 (harmless error analysis applies to jury instructions omitting element); *Griggs*, 569 F.3d at 344-45 (same). No one disputes that Medicare qualifies as a health care benefit program. *See United States v. Redcorn*, 528 F.3d 727, 734 (10th Cir. 2008) (noting Medicare and Medicaid are "unquestionably" health care benefit programs). And all agree that the surgeries at issue involved Medicare: Natale admits billing Medicare for the surgeries and admits to falsities in his operative reports, which—as we explain below—are material to Medicare's payment for the surgeries. Because "[t]here was never doubt" that the surgeries "involved" a health care benefit program, no harm resulted from the district court's failure to instruct on this issue. *See Griggs*, 569 F.3d at 345 ("There was never doubt that the conspiracy had involved the use of interstate communications by wire, which may be

---

[6] The government correctly characterizes Natale's argument as relying solely upon the "purpose, context, and legislative history" of the statute. While true that Natale could have provided more expansive textual analysis, Natale's failure to mine the statutory text for favorable arguments does not require us to close our eyes to the language of Congress.

why the lawyers and the district judge didn't notice the omission from the instructions.").[7]

### 2. The District Court's Plain Error in Failing to Instruct the Jury that the False Statements Must Be Material to the Health Care Benefit Program Was Harmless

Natale's next challenge attacks the district court's materiality instruction. As given, the instruction permitted the jury to convict as long as the false statement "had the effect of influencing the action *of a person or entity* or was capable of or had the potential to do so." (Emphasis added.) He posits that, by requiring materiality only as to a "person or entity," the jury instruction impermissibly broadened the scope of the statute

---

[7] Natale also argues that criminalizing false statements unhinged from the health care benefit program requirement would punish a broad swath of innocent conduct that Congress never intended to reach. For example, a patient who lies on the new patient questionnaire regarding his lifestyle habits (e.g., alcohol or tobacco use), past diseases, etc. may violate the law because such false statements would be made in connection with the delivery of health care services. Natale is correct, but these concerns are assuaged by our holding that § 1035 requires a matter involving a health care benefit program and false statements material to that health care benefit program. As we explain, these erroneous jury instructions were harmless in Natale's case, a result he cannot avoid by postulating how the government might abusively apply § 1035 on a different set of facts.

to include prosecution for false statements that relate to the delivery of health care benefits, items, or services but that have no effect on a health care benefit program. Natale urges that conviction under § 1035 requires false statements material to a health care benefit program rather than to any person or entity. Once again, Natale provides the proper interpretation of the statute but, because no harm flowed from this erroneous instruction, we see no need to overturn Natale's conviction.

### a.   False Statements Under § 1035 Must Be Material to the Health Care Benefit Program

Section 1035 only criminalizes "*materially* false, fictitious, or fraudulent statements or representations." (Emphasis added.) It does not, however, precisely describe *to what* or *to whom* the statements must be material. The text offers two possible answers. On one hand, "materially" could refer backward to the prefatory clause of the statute and require statements material to a health care benefit program. On the other, "materially" could look forward in the statute, requiring statements material to the delivery of or payment for health care benefits, items, or services. Either reading seems plausible from the text.

With the text ambiguous, we turn to similarly worded statutes and the legislative history for guidance. Analogy to § 1001 again proves helpful but, at first glance, not dispositive. Materiality under § 1001 requires "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Lupton*, 620 F.3d 790, 806

(7th Cir. 2010); *accord United States v. Turner*, 551 F.3d 657, 663 (7th Cir. 2008) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). Thus, courts have applied the materiality requirement of § 1001 to the jurisdictional element, requiring statements material to an agency within the U.S. government. In § 1035, the corresponding jurisdictional element is the health care benefit program requirement. Thus, applying the logic of § 1001 cases to § 1035 requires false statements material to the health care benefit program. But § 1001 has no element analogous to the "in connection with . . ." element in § 1035. The text of § 1001 thus contains only one point of reference for "materially." In contrast, § 1035 offers two possible references, making § 1035 more complex and minimizing the value of § 1001 as a comparator.

A close look at how the materiality requirement became a part of the statute, however, resolves the ambiguity and solidifies the comparative relevance of § 1001. In the beginning, the version of § 1035 passed in the House contained no materiality requirement. It read:

> Whoever, in any matter involving a health care benefit program, knowingly makes any false, fictitious, or fraudulent statements or representations . . . in connection with the delivery of or payment for health care benefits, items, or services, shall be fined . . . or imprisoned[.]

Health Insurance Portability and Accountability Act of 1996, H.R. 3103, 104th Cong., tit. II, § 244(a) (1996) (as passed by the House on Mar. 28, 1996). The House bill largely tracks the language of what ultimately

became law, with two main differences: It omits "will-fully," opting instead for only "knowingly" as the mens rea. And the House bill also lacks the word "materially," which in the final enactment precedes "false, fictitious, or fraudulent statements or representations."

These two words are found in the Senate bill, however. In the Senate version, someone commits a crime when he:

> in any matter involving a health care program, know-ingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation[.]

H.R. 3031, tit. V, § 544(a) (as amended and enacted by the Senate on Apr. 23, 1996).[8] Thus, the Senate bill con-tains the "materially" language absent from the House bill. It also much more closely tracks the language of § 1001, simply swapping out the federal government jurisdictional element in § 1001 for the health care program jurisdictional element relevant to the goals of § 1035. *Compare* H.R. 3031, tit. V, § 544(a) (as amended and enacted by the Senate on Apr. 23, 1996), *with* § 1001(a)(2) ("[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Gov-ernment . . ., knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined . . . or imprisoned[.]").

---

[8]   The bills have one other difference as well. The House version refers to a "health care benefit program" while the Senate version uses the term "health care program." Each phrase fills the same role, however, and we use both phrases interchange-ably in this discussion.

More importantly, in the Senate version, "materially" can *only* refer to a health care program for precisely the same reason "materially" in § 1001 refers only to an entity in the jurisdiction of the federal government: the Senate version lacked the "in connection with . . ." language found in the House bill so there was nothing else in the Senate version to which "materially" could refer. Thus, the Senate version quite clearly required false statements material to the health care benefit program, not false statements material to the delivery of health care benefits, items, or services.

The ambiguous language of the final enactment resulted from the combination of the Senate and House versions in Conference. The Conference Committee adopted the House language—including its "in connection with . . ." text—but inserted the "willfully" and "materially" requirements found in the Senate bill. H.R. Conf. Rep. No. 104-736, at 259 (1996). Thus, when the Conference Committee adopted the Senate's "materially" language, it also must have adopted the meaning ascribed to that language by the Senate. *See Int'l Ass'n of Bridge, Structural, & Ornamental Ironworkers v. NLRB*, 946 F.2d 1264, 1268-69 (7th Cir. 1991) (looking to Senate Report for statutory meaning when Conference Committee adopted Senate version of bill); *Frock v. U.S. R.R. Ret. Bd.*, 685 F.2d 1041, 1046 n.6 (7th Cir. 1982) (looking to explanation of Senate version of bill in Conference Report when Senate version ultimately adopted into law); *see also Valero Energy Corp. v. United States*, 569 F.3d 626, 634 (7th Cir. 2009) ("A conference report, unlike the words of a single [legislator], is often a good record of Congress's intent[.]"). And

because the Senate used "materially" to mean "material to a health care program" so too must that be the meaning of "materially" in the final enactment.

Finally, if statements material to the delivery of health care benefits, items, or services were sufficient to convict, the statute would criminalize a wide swath of seemingly innocent "white lies" totally unconnected to the conduct that motivated passage of the statute, *see* footnote 7, *supra*—health care fraud that detriments health care payers. *See* H.R. Rep. No. 104-747, at 2, 12 ("Congress should enact legislation to make health care fraud against public and private payers a Federal criminal offense."). Unless compelled to do so by the text, we are generally skeptical of interpretations of criminal statutes that broadly criminalize seemingly innocent activity. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) (noting "particular care [Supreme Court has] taken to avoid construing a statute to dispense with *mens rea* where doing so would 'criminalize a broad range of apparently innocent conduct'" (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)); *United States v. Yermian*, 468 U.S. 68, 71 (1984) (noting "if Congress had intended to prohibit all intentional deceit of the Federal Government, it would have used . . . broad language . . . which by its specific terms, extends broadly to every conspiracy to defraud the United States . . . ." (internal punctuation omitted)). In the end, nothing supports a reading of the statute that would require false statements material to the delivery of health care benefits, items, or services when the House bill contained no such materiality requirement and the Senate bill tied the materiality require-

ment to the health care benefit program.

This understanding of "materially" is notably absent from the district court's jury instructions, which broadened materially to include statements influencing or capable of influencing any person or entity. A proper instruction on the materiality element in § 1035 would require that false statements "ha[ve] a natural tendency to influence, or [are] capable of influencing, the decision of" the health care benefit program. *Kungys*, 485 U.S. at 770.[9]

### b. The District Court's Erroneous Materiality Instruction Was Harmless

Although the district court gave an erroneous materiality instruction, given the proof and arguments at trial, that error was harmless.[10] During closing argu-

---

[9] *Kungys* involved the meaning of materiality under a different statute, but it also explained that, in the context of criminal false statements, "material" is a "term[] that ha[s] accumulated settled meaning under either equity or the common law." 485 U.S. at 770. Thus, in using the word, "Congress means to incorporate [its] established meaning[.]" *Id.* As with the statute at issue in *Kungys*, when determining the meaning of "materiality" in § 1035, "we see no reason not to follow what has been done with the materiality requirement under other statutes dealing with misrepresentations[.]" *Id.* at 772.

[10] The ambiguity in the statute combined with the dearth of case law specifically interpreting the materiality requirement of
(continued...)

ments, the government told the jury that the false statements must "have the effect of influencing the action of Medicare or [were] capable of or had the potential to do so." Thus, the government never presented at trial the argument over which Natale now frets—that he violated the statute because his false statements in the operative reports were material to future treatment decisions made by other doctors. Instead, it argued and presented proof of materiality under the meaning Natale now advances, that the false statements contained in the operative reports and other notes were material to Medicare.

To that end, the government offered evidence that, when Medicare audits claims, it sometimes requests operative reports as well as other physician notes and documentation. Admittedly, Medicare never performed an audit in this case and never actually viewed the operative reports containing the false statements. But materiality requires only a potentiality of influencing the decisionmaker; it does not require actual reliance. *United States v. Gulley*, 992 F.2d 108, 112-13 (7th Cir. 1993). Notwithstanding Natale's assertions on appeal, he never argued to the jury that the false statements in the operative reports were not material to Medicare and never challenged the evidence that Medicare would rely on

---

[10] (...continued)

§ 1035 also suggests that such error was not plain. *See Olano*, 507 U.S. at 734 (plain error requires "error [that] is clear under current law").

operative reports during an audit. Instead, Natale argued intent. He admitted mistakes in the operative reports but told the jury those errors resulted from carelessness and an aversion to paperwork, not knowing and willful lies. And neither did the government ever argue that other doctors', rather than Medicare's, reliance on the operative reports satisfied the materiality requirement. True, the government did at times characterize these reports as important documents for a patient's future treatment. But it did so only to attack Natale's defense of carelessness: according to the government, a surgeon who highly valued and deeply cared for his patients—as Natale told the jury he did—would not haphazardly prepare documents so important for and critical to a patient's future care. Thus, the government told the jury, he must have knowingly and willfully lied.

In short, Natale's defense in this court differs from the defense he presented to the jury. The materiality of the statements in the operative reports simply was not in issue at trial. The government conceded that conviction required materiality as to Medicare and presented proof that Medicare would look to the operative reports in the event of an audit. Natale left that evidence unchallenged.

Natale suggests that his acquittal of health care fraud shows otherwise. "[T]he jury," he argues, "did not believe a relationship between the alleged 'false statements' and Medicare was proved beyond a reasonable doubt" or it would have convicted him of fraud. This conclusion, however, assumes congruence between all elements of

health care fraud and false statements. In truth (and perhaps unsurprisingly), the statutes differ. As explained more fully below, the health care fraud statute requires proof of specific intent to defraud while the false statement statute requires only knowing and willful false statements. Given Natale's defense focusing heavily on his innocent state of mind, the jury could have concluded that Natale lacked the specific intent to deceive required for a fraud conviction but nevertheless willfully filled his operative reports with statements he knew were false. As such, the jury's verdict is consistent with our own interpretation of the statute.

Finally, both Natale and amicus lament the possibility that misstatements in operative reports and other medical records may lead to federal indictment. Amicus especially worries about the chilling effect cases such as Natale's may have on medical record-keeping and its consequences on patient care. This concern is not completely misguided, but it does ignore the knowing and willful requirement in § 1035. The truly innocent mistakes over which amicus worries are not the deliberate falsehoods that federal law criminalizes. Natale was not convicted because he made innocent mistakes arising from carelessness in the preparation of his operative reports. He was convicted because the jury did not believe Natale when he told them he made innocent mistakes. In any event, to the extent § 1035 produces "unduly harsh result[s] on those who intentionally make false statements to [health care benefit providers], it is for Congress and not this [c]ourt to amend the criminal statute." *Yermian*, 468 U.S. at 75.

For these reasons, no harm accrued from the district court's inadequate jury instruction on materiality. That element held a secondary role to the real focus of the trial—Natale's state of mind. Natale cannot now argue harm from this error by putting forth a new defense on appeal simply because the jury disbelieved the one he proffered at trial.

### 3. The District Court Did Not Err in Omitting a Specific Intent Instruction

Natale argues that conviction under § 1035 requires proof of a specific intent to deceive. Neither the text nor context of the statute suggests § 1035 requires a specific intent to deceive.

To begin, nothing in the text of § 1035 explicitly requires that the defendant make a false statement with intent to deceive. As the Supreme Court explained when reviewing similar language in § 1001, nothing in the text "suggest[s] any additional element of intent, such as a requirement that false statements be [made] . . . 'with intent to deceive the Federal Government.'" *Yermian*, 468 U.S. at 69.

Indeed, when Congress has included intent to deceive as an element of a false statements crime, it has done so explicitly. *See* 18 U.S.C. § 513(a) (criminalizing "mak[ing], utter[ing], or possess[ing] a counterfeited security of a State . . . with intent to deceive another person . . ."); *id.* § 1033(a)(1) (criminalizing certain false statements made with "intent to deceive" by persons

"engaged in the business of insurance whose activities affect interstate commerce"); *id.* § 1861 (criminalizing false statements labeling property a public land if made with "intent to deceive the person to whom such representation is made"); *id.* § 2073 (criminalizing false entries of official records made with "intent to deceive"). Each of these statutes predated the enactment of § 1035. Thus, had Congress wanted to require specific intent in prosecutions for false statements related to health care services, it could easily have used the "intent to deceive" language found in these statutes.[11] *See Yermian*, 468 U.S. at 73. But Congress did not. Instead, it required false statements made in connection with the delivery of or payment for health care in a matter involving a health care benefit program and nothing more.

Given the absence of such statutory language, Natale looks to the "willfully" requirement as the textual anchor

---

[11] Explicit "intent to deceive" language was not even the only way Congress could have achieved this goal. For example, Congress could have criminalized false statements made *for the purpose of influencing* a health care benefit program, language it has used in other statutes, too. *See* 15 U.S.C. § 714m(a) (criminalizing some false statements made "for the purpose of influencing in any way the action of the Corporation"); 18 U.S.C. § 1014 (criminalizing false statements made "for the purpose of influencing in any way the action" of various federal agencies); *id.* § 1026 (criminalizing false statements made "for the purpose of influencing in any way the action of the Secretary of Agriculture"). But Congress did not even require this somewhat lesser purpose requirement in § 1035.

for an intent to deceive requirement. "[W]illfully," however, is "a notoriously plastic word." *United States v. Pulungan*, 569 F.3d 326, 329 (7th Cir. 2009). And we have previously refused to find an intent to deceive requirement in "willfulness" language from other, similarly worded false statement statutes. *United States v. Ranum*, for example, found no intent to deceive requirement in the "willful" mens rea required for conviction under the statute criminalizing false statements used to "obtain" federally-guaranteed student loans. 96 F.3d at 1027 (analyzing 20 U.S.C. § 1097(a)). In reaching that conclusion, *Ranum* strongly suggested conviction under § 1001 also required no specific intent to deceive. It specifically approved of the § 1001 pattern jury instruction on willfulness—used in Natale's case as well—that made no mention of intent to deceive. *Id.* at 1027-29. We do not stand alone in our suggestion that § 1001 has no specific intent requirement: the Supreme Court has suggested the same. Dicta in *Yermian* found language supporting a specific intent to deceive "[n]oticeably lacking" from § 1001. 468 U.S. at 73. Given the absence of explicit "intent to deceive" language in § 1035, we now follow the lead of *Ranum* and "refuse[] to supply, by judicial interpretation, an additional element of specific intent to deceive." *Ranum*, 96 F.3d at 1027.

Notwithstanding the Supreme Court's guidance in *Yermian*, some circuits have imposed a specific intent

requirement for conviction under § 1001.[12] Natale relies
heavily on these cases and also invokes Judge Eschbach's
*Ranum* dissent. Neither provides Natale an escape hatch

---

[12] *Compare United States v. Riccio*, 529 F.3d 40, 46-47 (1st Cir. 2008)
("willfulness" in § 1001 means "nothing more . . . than that the
defendant knew that his statement was false when he made
it or—which amounts in the law to the same thing—consciously
disregarded or averted his eyes from its likely falsity" (quoting
*United States v. Gonsalves*, 435 F.3d 64, 72 (1st Cir. 2006)));
*United States v. Russo*, No. 98-3245, 2000 WL 14298, at *5 (10th
Cir. Jan. 10, 2000) ("willful" in § 1001 "does not require proof
of evil intent but rather only that 'the act [was] done delib-
erately and with knowledge'" (quoting *Walker v. United States*,
192 F.2d 47, 49 (10th Cir. 1951))); *United States v. Hildebrandt*, 961
F.2d 116, 118-19 (8th Cir. 1992); ("willful" in § 1001 "simply
means that the defendant did the forbidden act 'deliberately
and with knowledge.' It is not necessary that the defendant act
with the intent to deceive the United States" (citations omitted));
*and United States v. Verduzco-Contreras*, No. 88-5120, 1990 WL
34147, at *3 (9th Cir. Mar. 27, 1990) ("[T]he government need not
prove intent to deceive under 18 U.S.C. § 1001." (citing *United
States v. Vaughn*, 797 F.2d 1485, 1490 (9th Cir. 1986))), *with
United States v. Guzman*, 781 F.2d 428, 431 (5th Cir. 1986) (§ 1001
requires a "false representation . . . that . . . is made with an
intent to deceive or mislead"); *United States v. Geisen*, 612 F.3d
471, 487 (6th Cir. 2010) (§ 1001 requires that the "statement
was made with knowledge of its falsity and an 'intent to de-
ceive'" (citations omitted)); *and United States v. Dothard*, 666
F.2d 498, 503 (11th Cir. 1982) ("Proof that the defendant has
the specific intent to deceive by making a false or fraudulent
statement is a prerequisite to conviction under 18 U.S.C. § 1001."
(citing *United States v. Lange*, 528 F.2d 1280, 1286 (5th Cir. 1976))).

from the glaring absence of this requirement in the text of the statute, though. The circuit split on § 1001 does nothing to undermine *Ranum*'s strong suggestion that, in this circuit, § 1001 requires no intent to deceive. In fact, *Ranum* considered and rejected those cases. 96 F.3d at 1029. Nor does the split call into question *Ranum*'s holding that § 1097 likewise requires no specific intent. Both statutes contain language similar to § 1035, and Natale provides no real explanation for why *Ranum* erred and the minority circuits' interpretation is correct.

Judge Eschbach's *Ranum* dissent similarly offers Natale no support. Judge Eschbach took issue with the *Ranum* majority's comparison to § 1001, rooting his disagreement in textual differences between § 1097(a) and § 1001. He explained that, in § 1097(a), the word "willfully" modified the phrase "obtains by" the making of a false statement. *Ranum*, 96 F.3d at 1032 (Eschbach, J., dissenting). Willfully obtaining through a false statement, he argued, necessarily requires intent to deceive. *Id.* The dissent even admitted "agree[ment] with the majority [that § 1097 would have no intent to deceive requirement] if the statute said 'any person who knowingly and willfully . . . makes a false statement . . . .'" *Id.* That precise language is found in § 1035(a): "Whoever . . . knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statements or representations . . . ." Thus, Judge Eschbach's reasoning actively undermines Natale's argument.

Placing § 1035 within the context of the entire statutory scheme that Congress enacted only confirms our reading

of the plain text. Congress enacted § 1035 as part of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Along with the provisions of § 1035, HIPAA criminalized health care fraud (among other health care specific criminal offenses). *See, e.g.*, 18 U.S.C. § 1347(a)(1) (making it illegal to "knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice to defraud any health care benefit program"). And intent to defraud itself requires a specific intent to deceive or mislead. *United States v. Awad*, 551 F.3d 930, 940 (9th Cir. 2009) (noting jury was instructed in § 1347 prosecution that "'intent to defraud' [is] defined as 'an intent to deceive or cheat'"); *United States v. Choiniere*, 517 F.3d 967, 972 (7th Cir. 2008) (noting jury instruction in § 1347 case defined "'intent to defraud' to mean 'that the acts charged were done knowingly with the intent to deceive or cheat the victims'"); *United States v. White*, 492 F.3d 380, 393-94 (6th Cir. 2007) (to convict under § 1347 "the government must prove the defendant's 'specific intent to deceive or defraud'"); *see also United States v. Vallone*, 698 F.3d 416, 483 (7th Cir. 2012) (citing *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010)); *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir. 2011) (citing *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010)). If health care fraud and health care false statements both required specific intent to deceive, the two statutes would criminalize essentially the same conduct. Especially because conviction for health care fraud carries twice the maximum penalty as the false statements statute, *compare* § 1035(a) (five-year maximum prison term), *with* § 1347(a) (ten-year maximum

prison term (twenty if the crime results in bodily injury)), an interpretation of the two statutes that covers substantially the same conduct makes no sense. Something must warrant the harsher penalty for the fraud charges. That something is the enhanced culpability attendant in a person's specific intent to deceive or mislead. Fraud requires that proof; false statements do not. Admittedly, "[t]he mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 359 n.4 (2005). But an interpretation of § 1035 that required intent to deceive would not merely criminalize conduct similar to that prohibited by § 1347, it would result in nearly complete overlap: any false statement made with intent to deceive would necessarily qualify as a scheme to defraud under § 1347. We find it odd that Congress would intend such a result from two statutes enacted in the same piece of legislation.

In short, the text of § 1035, courts' interpretations of similar text in other false statements statutes, and the context in which Congress enacted § 1035 all require the conclusion that § 1035 does not require proof of specific intent to deceive. The district court thus properly instructed the jury on the statute's willfulness requirement.[13]

---

[13] And just as "willfully" creates no specific intent to deceive requirement, neither does the statute's materiality requirement. A material statement has "'a natural tendency to influence, or [is] capable of influencing, the decision of' the decisionmaking

(continued...)

### 4. Application of § 1035 to Natale Did Not Violate Due Process

Natale's final challenge to the jury instructions asserts a due process violation. Application of § 1035 to situations where the false statements have no connection to Medicare, he argues, presents an unconstitutional lack of clarity that opens the statute to arbitrary and discriminatory enforcement. Natale concedes, however, that § 1035 satisfies constitutional rigor when applied to false statements material to a health care benefit plan. As we have explained, the proof at trial places Natale's case squarely within this category.

\* \* \*

To summarize, conviction for false statements relating to health care matters, 18 U.S.C. § 1035(a)(2), requires proof that the defendant (1) knowingly and willfully (2) made false, fictitious, or fraudulent statements or representations (3) in connection with the delivery of or payment for health care benefits, items, or services (4) in

---

[13] (...continued)

body to which it was addressed." *Kungys*, 485 U.S. at 770. As such, materiality objectively focuses on a *hypothetical listener's response* to the speech under the circumstances. In contrast, intent to deceive focuses on the *speaker's motivations* for the speech. Thus, materiality and intent to deceive differ: A speaker can make materially false statements without intending deception. A speaker can also make immaterial statements hoping to deceive. And, of course, a speaker could make materially false statements while intending deception.

any matter involving a health care benefit program, and (5) the statements were material to the health care benefit program. While materiality requires a natural tendency to influence, or be capable of influencing the health care benefit program, neither the materiality element nor the willfulness element requires the government to prove the defendant made the false statements with intent to deceive.

The district court's jury instructions in Natale's case did not reflect all of these requirements. Nevertheless, when viewed against the backdrop of the evidence presented at trial and Natale's defense to the jury, these errors did not affect Natale's substantial rights or render his trial unfair.

## B. Natale's Conviction Was Not a Manifest Injustice

Natale attacks the sufficiency of proof on which the jury convicted him of making false statements. He admits, however, that trial counsel never renewed his motion for judgment of acquittal at the close of evidence. Thus, to successfully attack the sufficiency of the evidence, he must show his conviction resulted in a manifest miscarriage of justice. *Turner*, 551 F.3d at 662. This "most demanding standard of appellate review" permits reversal only if "the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Id.* (quoting *United States v. Taylor*, 226 F.3d 593, 597-98 (7th Cir. 2000)). In attempting to satisfy this high bar, Natale argues the government produced

no evidence of either materiality or intent. Not so. To show materiality, the government presented testimony that, had Medicare audited the billing codes Natale submitted, it would have requested operative reports and medical notes. Because Medicare would have looked to and relied on these reports and notes in the event of an audit, the reports and notes were "capable of influencing" the decision of the health care benefit program. Thus, the record is not "devoid" of evidence on materiality.

And neither is the record "devoid" of evidence on intent. Natale readily admits he "kept inaccurate and imprecise records." The crux of argument at trial centered on whether that inaccuracy and imprecision resulted from innocent carelessness or knowing and willful misrepresentations. The Medicare representative testified that when physicians enroll as providers under Medicare, they receive multiple notices regarding the need to accurately complete forms and truthfully represent services rendered. Moreover, at least some of the false statements occurred during or shortly after the surgery, casting doubt on Natale's assertions that he inadvertently described the incorrect procedure because of his delay in preparing the notes. On top of that, many of Natale's notes proved quite detailed—not the vague generalities that usually accompany inaccuracies resulting from carelessness, inadvertence, or the passage of time. From all this evidence, the jury could infer that the false statements resulted from knowing deliberation rather than careless inadvertence. Natale ignores this evidence and now re-litigates his carelessness defense on appeal. The jury disbelieved that story,

and the evidence permitted the jury to infer knowledge and willfulness. As a result, Natale cannot establish that a manifest miscarriage of justice occurred.

### C.  The District Court Did Not Err in Permitting the Jury to Take Anton's Demonstratives into the Jury Room

Natale also appeals the district court's decision to permit the jury to bring Anton's demonstratives into the jury room during deliberations. We review the district court's decision to send demonstratives to the jury room for abuse of discretion. *Salerno*, 108 F.3d at 742.

So long as the court is "evenhanded" in ruling on the evidence, it has "wide discretion" in determining whether to allow the jury to take an exhibit to the jury room. *Id.* at 745. The district court here showed such fairness, offering Natale as well the opportunity to send demonstrative exhibits to the jury room (which he ultimately accepted). Nevertheless, Natale argues that the Anton diagrams misled the jury by "strongly suggest[ing] to the jury that the bifurcation graft versus tube graft issue was significant because of the gross difference in shape, size and general appearance of the grafts in the illustrations." In reality, he continues, Anton's assertions that the operative reports described a bifurcation graft were immaterial because the government never argued that he billed Medicare for such grafts.

Natale is correct that the billing codes he submitted identified procedures related to the renal arteries, not use of bifurcation grafts. But he does not dispute that the

operative reports contained inaccuracies and that those inaccuracies suggested use of a bifurcation graft. The important question is not whether the demonstratives accurately reflected what he billed to Medicare but whether the demonstratives accurately reflected what they purported to show: Natale's descriptions of the procedures in the operative reports as compared to the procedures depicted in the CT scans. Natale gives no suggestion that they mislead the jury in that respect. He admits the operative reports contained inaccuracies but offers no evidence showing the demonstratives inaccurately depict the statements in his operative reports.[14] In that sense, the demonstratives simply portray what, as the government points out, Natale has conceded.

Nor did the demonstratives have the impermissible effect of "transporting" Anton into the jury room during deliberations. The demonstratives used during Anton's testimony contained various labels identifying which diagram depicted Anton's conclusions and which diagram depicted the procedure described in Natale's operative notes. The government removed these labels from the exhibits sent to the jury room, however, requiring jurors to identify the content of the demonstra-

---

[14] Natale does point to one inaccuracy in the demonstratives. Anton admitted at trial that the demonstrative contained one error, describing the attachment of one tube graft as "end-to-end" when it should have read "end-to-side." This minor error has no bearing on the thrust of Natale's operative reports. In any event, Anton corrected himself in front of the jury so the jury was aware of this small mistake.

tives from their recollection of Anton's testimony. Thus, the demonstratives did not have the effect of sending Anton himself into the jury room with the jurors. Contrary to Natale's suggestion, *United States v. Ware* does not require a conclusion otherwise. That case focused on the admissibility of the evidence, noting only that this error in admission was "compounded" by the district court's decision to allow juror use of the exhibits during deliberations. *United States v. Ware*, 247 F.2d 698, 700-01 (7th Cir. 1957). Natale does not contest the admission of the demonstratives here so *Ware* offers no support for his argument.

In short, Natale fully admitted discrepancies between the procedures described in his operative reports and the procedures he performed. He cannot now suggest prejudice in permitting the jury during deliberations to examine demonstrative evidence consistent with his own admissions.

### D.  The District Court Did Not Abuse Its Discretion in Excluding the Government Report

Natale's final attempt at overturning his conviction focuses on the district court's exclusion of a report published by the Department of Health and Human Services (HHS). The report showed error rates in Medicare coding and payments as high as 46% for claims submitted by vascular surgeons in this region. The district court excluded the evidence as irrelevant and as hearsay. We review evidentiary rulings for abuse of discretion. *United States v. Cunningham*, 462 F.3d 708, 712 (7th Cir. 2006).

Ultimately, we need not consider Natale's arguments on this front because any error in the district court's exclusion of the report was harmless. *See United States v. Jackson*, 540 F.3d 578, 593 (7th Cir. 2008) ("Even if the district court erred in excluding such evidence, we will not reverse if the error was harmless.").

Relevant evidence has the tendency to make any fact of consequence more or less probable. Fed. R. Evid. 401. According to Natale, a governmental report demonstrating a 46% error rate bears directly on his intent, supporting his argument that he made a good faith effort to find the Medicare code that most accurately described the procedure he performed when Medicare provided no billing code directly on point.

Regardless of the propriety of the district court's conclusions on relevance and hearsay, Natale's own brief explains why, as the case stands now, the report has no relevance and any error from its exclusion is harmless. "That the error rate approached 50 percent," he explained, "strongly suggests significant caution before inferring intent to defraud or mislead from an inaccuracy." Thus, the only relevance Natale offers to justify admission of the report lies in the jury's determination of intent to defraud or mislead. Natale was acquitted on the fraud charges, though, and as we have explained, § 1035 requires no specific intent to deceive. The only intent relevant to Natale's conviction was whether he knowingly and willfully included false statements in the operative reports, a question having nothing to do with Medicare billing inaccuracies.

Moreover, false statements in Natale's operative reports and other physician notes—not his submission of the Medicare billing codes—provided the basis for his conviction under § 1035. Other physicians' errors in submitting Medicare billing codes tell us nothing about the mistakes Natale made in *his own* records and re-ports. Because the jury acquitted Natale of the fraud charges related to his Medicare billing, any error in the district court's exclusion of the reports now stands harmless.

### III. Conclusion

The instructions under which the jury convicted Natale were erroneous. They permitted conviction for false statements having no relation to a health care benefit program in direct contradiction to the textual require-ments of the statute. Notwithstanding these erroneous instructions, the proof at trial was more than sufficient to show that the surgeries described in the indictment involved a health care benefit program, Medicare, and that Natale's false statements were material to Medicare. Thus, the erroneous instructions were harmless. Likewise, the government presented sufficient evidence of materiality and intent so no manifest miscarriage of justice resulted from Natale's conviction. Finally, neither of the challenged evidentiary decisions requires reversal. The district court's permission to send the demonstratives to the jury room during deliberations was not erroneous, and Natale's acquittal on the fraud counts rendered harmless any error in the district court's

exclusion of the HHS report. We AFFIRM Natale's conviction.